ORIGINAL

# United States Court of Appeals for the Federal Circuit

FILED
JAN 4 2008
U.S. COURT OF FEDERAL CLAIMS

2006-5029

THE LONG ISLAND SAVINGS BANK, FSB,
and THE LONG ISLAND SAVINGS BANK OF CENTEREACH FSB,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

## *Judgment*

ON APPEAL from the UNITED STATES COURT OF FEDERAL CLAIMS

IN CASE NO(S): 92-CV-517

This CAUSE having been heard and considered, it is

ORDERED and ADJUDGED:

**REVERSED.**

*ENTERED BY ORDER OF THE COURT*

*DATED* SEP 13 2007

Jan Horbaly, Clerk

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
By: Date: 1/4/08

ISSUED AS A MANDATE: JAN 4 2008

# United States Court of Appeals for the Federal Circuit

FILED
JAN 4 2008
U.S. COURT OF FEDERAL CLAIMS

2006-5029

THE LONG ISLAND SAVINGS BANK, FSB,
and THE LONG ISLAND SAVINGS BANK OF CENTEREACH FSB,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

Richard C. Tufaro, Milbank, Tweed, Hadley, & McCloy, LLP, of Washington, DC, argued for plaintiffs-appellees. With him on the brief was William W. Wallace III. Of counsel on the brief were David S. Cohen, and Andrew M. Leblanc.

Jeffrey T. Infelise, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director. Of counsel on the brief were Jeanne E. Davidson, Deputy Director, Timothy J. Abraham, and Elizabeth A. Holt, Trial Attorneys. Of counsel was Jerome A. Madden, Attorney.

Appealed from: United States Court of Federal Claims

Judge Charles F. Lettow

# United States Court of Appeals for the Federal Circuit

2006-5029

THE LONG ISLAND SAVINGS BANK, FSB,
and THE LONG ISLAND SAVINGS BANK OF CENTEREACH FSB,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

---

DECIDED: September 13, 2007

---

Before MAYER, GAJARSA, and LINN, Circuit Judges.

GAJARSA, Circuit Judge.

In this Winstar-related case, the United States appeals a decision of the United States Court of Federal Claims granting a motion for summary judgment by the Long Island Savings Bank, FSB ("LISB") and the Long Island Savings Bank of Centereach FSB ("Centereach") on the government's counterclaim and affirmative defenses. Long Island Sav. Bank, FSB v. United States ("LISB Summ. J."), 54 Fed. Cl. 607 (2002). The United States also appeals the decision of the Court of Federal Claims after trial awarding breach of contract damages to LISB and Centereach in the amount of $435,755,000. Long Island Sav. Bank, FSB v. United States ("LISB Trial"), 67 Fed. Cl. 616 (2005).

On February 1, 2007, this court held the banks' claims against the government to be forfeited under 28 U.S.C. § 2514 and thus reversed. Long Island Sav. Bank, FSB v. United States, 476 F.3d 917 (Fed. Cir. 2007). The banks filed a combined petition for panel rehearing and rehearing en banc; a response thereto was invited by the court and filed by the government. Acting en banc, the court returned the case to the original panel for revision.

Accordingly, the previous opinion of the court in this appeal, issued on February 1, 2007, and reported at 476 F.3d 917, is withdrawn and vacated. Because we hold that the contract is tainted from its inception by fraud and thus void ab initio, and that the claims against the government are excused by prior material breach, we reach the same disposition as our previous opinion and reverse the decision of the Court of Federal Claims.

I.

This case is another of the many Winstar-cases arising from the savings and loan crisis of the 1980s. See generally United States v. Winstar Corp., 518 U.S. 839 (1996). The facts and procedural history pertinent to this appeal follow.

A. **The Parties and the Contract**

In April 1982, the Federal Savings and Loan Insurance Corporation ("FSLIC") created Suffolk County Federal Savings and Loan Association ("Suffolk County") by merging two thrifts on Long Island that were incurring significant operating losses. LISB Trial, 67 Fed. Cl. at 619. In October 1982, FSLIC undertook a national solicitation for potential acquirers of Suffolk County because its financial condition continued to decline. Id. at 620. FSLIC determined that of the six bids received, the bid from LISB, a

conservatively run and healthy thrift bank with branches in New York state, was the most favorable. Id. at 621. Specifically, "FSLIC had determined that LISB's bid was the most attractive of all bids, both because it proposed the least amount of financial assistance from FSLIC and because FSLIC was attracted by LISB's proven record of sound financial management." Compl. ¶ 24 (emphasis added). Negotiations began, and the parties executed a final Assistance Agreement on August 17, 1983. LISB Trial, 67 Fed. Cl. at 619.

Pursuant to the Assistance Agreement, Suffolk County converted "from a federal mutual savings and loan association into a federal stock savings bank" and changed its name to Centereach, and LISB acquired Centereach as a wholly owned subsidiary by purchasing 100% of Centereach's authorized common stock for $100,000. Assistance Agreement at 1. The agreement required the government to make a direct cash contribution of $75 million to Centereach's net worth account within three business days of the conversion and acquisition. Id. § 3. In total, the government infused $122 million into Centereach under the Assistance Agreement and related agreements. LISB Summ. J., 54 Fed. Cl. at 610. In addition, the government agreed that LISB and Centereach could use "the accounting principles in effect for mergers and acquisitions prior to the issuance of FASB #72" to account for the acquisition. Assistance Agreement § 10. Those accounting principles enabled Centereach to account for approximately $625.4 million of goodwill to be amortized over forty years by the straight-line method. LISB Trial, 67 Fed. Cl. at 622. See generally Winstar, 518 U.S. at 853-56 (describing goodwill accounting allowed by FSLIC and advantages to acquiring institutions).

The Assistance Agreement explicitly conditioned the government's obligations on, inter alia, the "receipt of a certificate, dated as of the Purchase Date, signed by the Chairman of the Board of LISB," who as discussed infra Part I.B was James J. Conway, Jr., stating that:

> (A) The representations and warranties of LISB set forth in § 11(b) are true and substantially correct as of the Purchase Date; and
>
> (B) No event has occurred and is continuing on the Purchase Date which would constitute, or which with notice or lapse of time or both would constitute, a Breach.

Assistance Agreement § 2(c)(7). Of pertinence here, LISB represented and warranted in section 11(b)(5) the following:

> Compliance With Law. Except as disclosed in Exhibit G, LISB is not in violation of any applicable statutes, regulations or orders of, or any restrictions imposed by, the United States of America or any state, municipality or other political subdivision or any agency of the foregoing public units, regarding the conduct of its business and the ownership of its properties, including, without limitation, all applicable statutes, regulations, orders and restrictions relating to savings and loan associations, equal employment opportunities, employment retirement income security, and environmental standards and controls where such violation would materially and adversely affect LISB's business, operations or condition, financial or otherwise.

(Emphasis added). LISB also represented and warranted in section 11(b)(9):

> Material Facts. This Agreement and all information furnished by LISB in connection with this Agreement or the Master Agreement do not contain any untrue statement of a material fact or omit to state a material fact necessary to be stated in order to make the statements contained therein not misleading; and there is no fact which materially adversely affects or in the affect the business operation, affairs or condition, financial or otherwise, of LISB or any of its properties or assets which has not been set forth in this Agreement, the Master Agreement or the other documents furnished under either Agreement.

(Emphasis added). It is undisputed that LISB's Chairman certified to the government that the "representations and warranties of LISB set forth in § 11(b) are true and substantially correct" as required by section 2(c)(7) of the Assistance Agreement.

Section 16 specified that "[t]his Agreement and the rights and obligations under it shall be governed by the law of the State of New York to the extent that Federal law does not control."

B. Conway and his Law Firm Compensation

LISB and Centereach entered into the Assistance Agreement through their Chairman of the Board of Trustees and CEO James J. Conway, Jr. Assistance Agreement at 31. During his tenure at LISB and Centereach, Conway also received compensation from the law firm Conway & Ryan. The banks agree that Conway & Ryan was their "primary outside counsel" that "performed mortgage closing services and occasionally represented [LISB] in foreclosure proceedings," and that a "substantial portion" of the law firm's revenues were from the banks' mortgage closing services. The parties' summary judgment submissions show that the law firm, starting in 1980 and ending with the firm's dissolution in 1992, derived at least 70% of its revenues from LISB. "From 1982 to 1991, Conway caused LISB to utilize the firm as LISB's sole mortgage closing counsel, and he ensured that the firm had the exclusive right to represent LISB in connection with all mortgage closings without action from the Board." LISB Summ. J., 54 Fed. Cl. at 610.

Conway, an attorney admitted to the New York state bar, had worked for the law firm since 1953. Conway became a member of LISB's Board of Trustees in 1966 and the Chairman in 1976. In 1980, Conway received two legal opinions, one provided

unsolicited by a partner at the law firm and one solicited by Conway from an outside attorney, stating that New York law prohibited him from receiving compensation from the law firm for legal services relating to any of the banks' loans.

In January 1982, the Board elected Conway to be LISB's CEO. After becoming CEO of LISB, Conway stopped practicing law and engaging in other professional services for the law firm. However, Conway continued to receive compensation from the law firm, and the banks agree that "Conway's compensation included revenues received by [the law firm] for performing" the "banks' mortgage closing services." From September 1975, when Conway & Ryan was incorporated as a New York professional corporation, to December 1984, Conway owned 65% of the law firm. Accordingly, Conway received at least 60% of the law firm's income for the fiscal years ending in August 1981, 1982, and 1983.

In December 1984, Conway reduced his ownership interest to 9% by, in part, transferring 51% of the law firm to his daughter. Around that time, Conway had become aware of a thrift regulation restricting his ownership interest in the law firm to less than 10%. Conway retained his 9% ownership interest until December 1989. Conway, his daughter, and his daughter-in-law collectively, however, continued to own at least 60% of the law firm. Accordingly, while Conway received between 9% and 40% of the law firm's annual income after 1984, Conway, his daughter, and his daughter-in-law collectively received at least 60% annually, except for the fiscal year ending in August 1985 when they received 51%.

Between 1980 and 1989, Conway personally received at least $3.5 million from the law firm. Collectively, Conway, his daughter, and his daughter-in-law received at least $10.9 million from the law firm during the same time period.

While there were multiple opportunities to disclose this continuing financial distribution, neither Conway nor LISB disclosed the compensation from the law firm during this time period. In December 1981, LISB "applied for conversion from a state-chartered mutual savings bank to a Federal mutual savings bank charter." To determine eligibility for conversion, the Federal Home Loan Bank Board ("FHLBB") required LISB to answer a management questionnaire, and LISB's president "stated that he [wa]s aware that approval of the application to convert w[ould] require that [LISB] adhere to various Federal and Insurance Regulations." LISB submitted, inter alia, the following responses (in italics, underlined emphasis added) in February 1982.

> 6. List each enterprise doing business with the institution in which any of the institution's personnel have a direct or indirect interest. If such enterprise has had any business transactions with the institution since the last examination, indicate the nature of the interest and the volume and type of business involved. If the association provides space, employees, equipment, services, or expenses, explain the arrangement in full.
>
> *Officer James J. Conway, Jr. retains an interest in a law firm that presently renders service to the Bank and <u>receives remuneration from outside income of said firm</u>.*
>
> * * *
>
> 9. List any affiliated person of the institution who receives any commission, fee, or rebate from outside sources, or benefits, directly or indirectly, from financing or any other business placed through, by, or with the institution, if such information has not been furnished in response to questions six (6), seven (7), and eight (8). Name such persons and state the amount and purpose of, and the basis and reasons for, such disbursements, credits or other benefits.

*NONE*

In February 1983, July 1984, and April 1986, LISB submitted the same answers regarding Conway in response to subsequent FHLBB examinations. In December 1987, FHLBB employed a different management questionnaire, but LISB continued to respond that Conway "retains an interest in a law firm that presently renders service to the Bank and receives remuneration from outside income of said firm" (emphasis added).

In its summary judgment briefs to the Court of Federal Claims and on appeal, the government submitted an affidavit from the government's supervisory agent responsible for recommending whether LISB's acquisition of Centereach should be approved in 1983. The affidavit stated that :

> Had Mr. Conway correctly and accurately revealed the nature and substance of the kickback scheme and/or the fact that Mr. Conway was violating the RESPA anti-kickback provision prior to and during negotiations with the FSLIC and FHLBB for the Suffolk acquisition, I would have recommended that we discontinue discussions and negotiations with [LISB] regarding its acquisition of Suffolk, and I would have recommended that [LISB] be removed as a bidder for Suffolk and or any other supervisory acquisition. I also would not have recommended that [LISB] be permitted to purchase Suffolk.

Vigna Aff. ¶ 14. The affidavit also stated that "FSLIC and FHLBB would not provide financial or regulatory assistance to acquirers engaged in the type of serious impropriety at issue in this case." Id. ¶ 15.

C. **Enactment of FIRREA**

On August 9, 1989, the Government enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989), which restricted Centereach's ability to count supervisory goodwill and capital

credit toward compliance with its tangible capital requirement. As the Supreme Court noted in Winstar, 518 U.S. at 857, "[t]he impact of FIRREA's new capital requirements upon institutions that had acquired failed thrifts in exchange for supervisory goodwill was swift and severe." Many institutions fell out of compliance and were either seized by government regulators or stayed in business only after "massive private recapitalization." Id. at 857-58.

"With FIRREA, Centereach's capital ratio plummeted from more than 8% positive to a negative 11%." LISB Trial, 67 Fed. Cl. at 623. In addition, the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), Pub. L. No. 102-242, 105 Stat. 2236 (1991), established sanctions through regulation to institutions deemed undercapitalized. The management of LISB and Centereach thus embarked on a restructuring plan, which involved selling branches, securities, and loans, paying down other borrowings, merging LISB and Centereach, and writing off goodwill. LISB Trial, 67 Fed. Cl. at 625, 627-28.

Several institutions sued the government "[b]elieving that [FHLBB] and FSLIC had promised them that the supervisory goodwill created in their merger transactions could be counted toward regulatory capital requirements," and the Supreme Court subsequently held in Winstar that neither the canon of unmistakeability nor the doctrine of sovereign acts prevented the government from being liable for breaching contracts by subsequently changing the relevant law. 518 U.S. at 843, 858, 860.

## D. Complaint Against the Government, the Discovery of Conway's Law Firm Compensation, and the Government's Affirmative Defenses

With the enactment of FIRREA, Conway, as Chairman of the Board of Trustees and CEO of the banks, hired an outside law firm to advise the banks. See Doe v. Poe,

595 N.Y.S.2d 503, 189 A.D.2d 132 (N.Y. App. Div. 1993). In February 1990, Conway, the banks' president, the outside law firm, and another outside law firm that Conway had hired for the banks met to discuss a lawsuit by the banks against the government. The outside law firms "suggested that, in preparation for the pending Federal litigation and upcoming regulatory inspections, they conduct a 'due diligence' inquiry to determine whether the bank[s were] in compliance with all regulatory requirements." Conway and the president of the banks agreed. See id. at 503-04. In two meetings that year, the outside law firms discovered the law firm compensation that Conway was receiving and in August 1990, advised Conway to retain his own counsel. See id. at 504. "Sometime thereafter, a special committee of the bank[s'] board of trustees was formed to investigate the relationship between [Conway], his family, and his former law firm." Id. Conway filed suit in New York state court to enjoin the outside law firms from disclosing to the committee the information learned from the meetings based on attorney-client privilege. See id. at 504.

In June 1992, Conway resigned from LISB and Centereach. In August 1992, LISB and Centereach filed a complaint against the government in the Court of Federal Claims alleging that the government breached its contractual obligations by enacting FIRREA. According to the banks, "[i]n September 1992, the [New York state] court rejected Conway's claim [seeking to enjoin the outside law firms from disclosing the information to the banks]. The Banks immediately informed OTS upon learning the facts of Conway's relationship with [his law firm]." Appellee Br. 42.

In February 1993, OTS commenced an investigation into Conway's law firm compensation. Based on its findings, OTS concluded that Conway "engaged in

violations of federal conflict-of-interest and disclosure regulations, participated in conflicts of interest constituting an unsafe or unsound practice within the meaning of 12 C.F.R. § 571.7, and breached his fiduciary duty owed to LONG ISLAND SAVINGS." J.A. 300455. In February 1994, "while neither admitting or denying the OTS' findings and conclusions," Conway entered into a consent order with OTS in which Conway stipulated and consented to the order banning him from the thrift and banking industry and requiring him to pay $1.3 million in restitution to LISB. J.A. 300456-57.

In February 1998, Conway pled guilty to a criminal misdemeanor information charging him with violating 18 U.S.C. § 215.[1] Specifically, Conway agreed with the following facts: "[i]n his capacity as chief executive officer and Chairman of LISB, . . . [Conway] influenced whether LISB continued to use the law firm as its legal counsel for residential mortgage closings"; "[f]rom 1983 through 1989, while holding his executive LISB positions, [Conway] received $3,194,103.87 in compensation from the law firm"; and "[i]n or about and between September 3, 1986, and October 30, 1987, . . . [Conway] knowingly, intentionally and corruptly solicit[ed], demanded, accepted and agreed to accept . . . funds from the law firm paid directly to him, . . . intending to be influenced and rewarded in connection with . . . the assignment of the LISB residential mortgage closing work to the law firm."

This conviction led the New York Supreme Court, Appellate Division, to disbar Conway for professional misconduct in August 2000. In re Conway, 712 N.Y.S.2d 610, 275 A.D.2d 24 (N.Y. App. Div. 2000). Specifically, the court found:

---

[1] 18 U.S.C. § 215 is a criminal statute governing the receipt of commissions or gifts for procuring loans by an "officer, director, employee, agent, or attorney of a financial institution."

> The mitigating circumstances proffered by the respondent notwithstanding, the fact remains that, while chairman of the board and chief executive officer of a savings bank, he engaged in a scheme of illegal kickbacks, using his daughter and daughter-in-law as conduits to circumvent Federal law prohibiting him from receiving compensation from his former law firm, which relied on the bank for approximately 90% of its business. The payments were substantial, totalling [sic] more than three million dollars. Such misconduct, which went on for several years, can hardly be deemed aberrational.

Id. at 611.

In February 2001, the government filed its answer to the complaint in the Court of Federal Claims. The government's answer included affirmative defenses and counterclaims asserting forfeiture of the plaintiffs' claims and recission of the contract "because the thrifts committed fraud in the inducement as well as fraud in the performance of the alleged contract." Answer ¶¶ 175-84. According to the government, it submitted this filing—answer, affirmative defenses, and counterclaims—before the time negotiated by the parties. See U.S. Summ. J. Reply 38-41 (May 30, 2001) (detailing stay of Winstar-related cases pending Supreme Court decision and Omnibus Case Management Order stating in part that the government (a) in responding to plaintiffs' summary judgment motion "need not identify any defenses of any kind, counterclaims, set-offs, pleas in fraud" and that "the failure to assert those defenses in its response will not constitute a waiver" and (b) "shall not file an answer to the complaint in any case, and no defenses or arguments of any kind shall be deemed waived by reason of defendant's not having filed an answer to any complaint"). The record indicates that the banks do not dispute this procedural history. See Pls.' Summ. J. Surreply 20-21 (Jun. 18, 2001) (discussing timeliness without disputing government's representation of procedural history).

E. Proceedings Before the Court of Federal Claims

On December 9, 2002, the Court of Federal Claims decided in favor of LISB and Centereach on the parties' cross-motions for summary judgment on the government's affirmative defenses and counterclaims. LISB Summ. J., 54 Fed. Cl. 607. Specifically, the Court of Federal Claims found that "Conway and his firm's status as 'affiliated persons' did not cause LISB to be in violation of the Assistance Agreement," id. at 612-14; that it "cannot conclude that LISB, as a corporate entity, acted fraudulently," id. at 614-18; and that Conway's conflict-of-interest conduct could not be imputed to LISB, id. at 618-19. The Court of Federal Claims thus rejected the government's summary judgment motion asserting that "(1) plaintiffs' claims are forfeited under a special plea in fraud pursuant to 28 U.S.C. § 2514; (2) common law fraud renders the contract unenforceable; (3) the contract should be rescinded and $122 million repaid to the Government; and (4) plaintiffs' prior material breach precludes damages." LISB Summ. J., 54 Fed. Cl. at 609.

On September 15, 2005, after a twenty-four day trial, post-trial briefing, and closing arguments, the Court of Federal Claims issued its opinion and order holding the government liable and awarding $435,755,000 in damages to LISB and Centereach. LISB Trial, 67 Fed. Cl. at 618.

The government appeals the granting of summary judgment regarding its affirmative defenses in favor of LISB and Centereach in LISB Summ. J. and the determination of damages in LISB Trial. The Court of Federal Claims exercised jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and entered final

judgment on September 30, 2005. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

II.

The Court of Federal Claims applies the same summary judgment standard as that of federal district courts: summary judgment is proper if the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Ct. Fed. Cl. R. 56(c); Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1337 (Fed. Cir. 2005). Therefore, we review a grant of summary judgment by the Court of Federal Claims de novo, drawing justifiable factual inferences in favor of the party opposing the judgment. SmithKline, 403 F.3d at 1337; Winstar Corp. v. United States, 64 F.3d 1531, 1539 (Fed. Cir. 1995) (en banc). Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Issues of fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

III.

A. **Federal Common Law Fraud**

The government asserted that the plaintiffs committed fraud in the inducement as well as fraud in the performance of the contract and that federal common law renders the Assistance Agreement unenforceable. Answer ¶¶ 175-81; U.S. Summ. J. Mot. 31-47 (Apr. 17, 2001); LISB Summ. J., 54 Fed. Cl. at 609, 615. The plaintiffs asserted that

there was neither fraud in the inducement nor fraud in the performance of the Assistance Agreement and that any counterclaims and affirmative defenses based on common law fraud fail. Pls.' Summ J. Mem. 41-55 (May 3, 2001). The Court of Federal Claims agreed with the plaintiffs. LISB Summ. J., 54 Fed. Cl. at 620. We reverse.

Procedurally, while the parties' briefs to this court could appear to focus on the government's special plea in fraud under 28 U.S.C. § 2514, the issue of federal common law fraud is properly before this court. In City of Sherrill v. Oneida Indian Nation, 544 U.S. 197 (2005), the Supreme Court "resolve[d] th[e] case on considerations not discretely identified in the parties' briefs," stating that the question addressed "is inextricably linked to, and is thus 'fairly included' within, the questions presented." Id. at 214 n.8; see also Connor v. Finch, 431 U.S. 407, 421 n.19 (1977) (stating that issues may "appropriately be viewed as an issue implicitly raised by the parties"). In this case, the parties' briefs to the Court of Federal Claims and the opinion of the Court of Federal Claims meshed fraud under 28 U.S.C. § 2514 together with fraud under common law. Indeed, the Court of Federal Claims evaluated the elements of common law fraud as the elements of § 2514. LISB Summ. J., 54 Fed. Cl. at 615. Similarly, in the government's brief to this court, the pertinent issue presented is "[w]hether the trial court erred, as a matter of law, in refusing to impute knowledge of fraud in the inducement of a Government contract from the chairman and chief executive officer of the plaintiff, Long Island Savings Bank, FSB ('LISB'), to the institution itself." Appellant Br. 2 (emphasis added). Therefore, to the extent that the government's defense based on federal common law fraud was not explicitly appealed, we find that the defense "is inextricably linked to, and is thus 'fairly included' within, the

questions presented." Sherill, 544 U.S. at 214 n.8. Moreover, under these circumstances, we can exercise our discretion to apply federal common law in this case. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 800 (Fed. Cir. 1990) (stating that "practice of [waiving an issue not raised by an appellant in its opening brief] is, of course, not governed by a rigid rule but may as a matter of discretion not be adhered to where circumstances indicate that it would result in basically unfair procedure"); cf. Harris Corp. v. Ericsson Inc., 417 F.3d 1241, 1251-52 (Fed. Cir. 2005) (stating that "[a]n appellate court retains case-by-case discretion over whether to apply waiver," and holding that claim construction arguments "advocating the same concept" are properly addressed). Therefore, we proceed to evaluate the merits of the government's common law fraud assertion.

The Supreme Court has stated that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Winstar, 518 U.S. at 895. The Court has also stated that "[i]t is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law," Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411 (1947), "which become federal common law," Fomby-Denson v. Dep't of Navy, 247 F.3d 1366, 1373-74 (Fed. Cir. 2001). In this case, the parties have not asserted that Congress has adopted a standard other than federal common law. Indeed, the parties recognized the governing

role of federal common law in the Assistance Agreement, which states in section 16 that "[t]his Agreement and the rights and obligations under it shall be governed by the law of the State of New York to the extent that Federal law does not control." In short, federal common law governs this action.

The Restatement of Contracts reflects many of the contract principles of federal common law. Cf. Mobil Oil Exploration & Producing Se., Inc. v. United States, 530 U.S. 604, 608 (2000) (relying similarly on the Restatement of Contracts for principles of repudiation and restitution); Franconia Assocs. v. United States, 536 U.S. 129, 141-43 (2002) (applying principles of general contract law by relying in part on Restatement (Second) of Contracts (1979) to determine whether contract claim against federal government was within Tucker Act statute of limitations). As set forth in the Restatement of Contracts, a misrepresentation may prevent the formation of a contract or may make a contract voidable. See Restatement (Second) of Contracts §§ 163-64 (1981). The difference between the former and the latter is sometimes referred to as the difference between misrepresentations that make a contract "void" versus "voidable." See id. § 7 cmt. a, § 163 cmt. c.

We have stated that "the general rule is that a Government contract tainted by fraud or wrongdoing is void ab initio." Godley v. United States, 5 F.3d 1473, 1476 (Fed. Cir. 1993) (citing United States v. Miss. Valley Generating Co., 364 U.S. 520, 564 (1961), and J.E.T.S., Inc. v. United States, 838 F.2d 1196, 1200 (Fed. Cir. 1988)).[2] We established this rule in J.E.T.S., which held that a government contractor's false certification barred its subsequent claim. 838 F.2d at 1197. Specifically, we stated:

---

[2] But see United States v. Jamieson Sci. & Eng'g, Inc., 214 F.3d 1372, 1377 (D.C. Cir. 2000) (disagreeing with J.E.T.S. and Godley).

> The contract which, according to the Board's decision in the first case, the government constructively had changed, was procured by and therefore permeated with fraud. As discussed in part III below, J.E.T.S. obtained this contract by knowingly falsely stating that it was a small business. Had it stated the truth about its size, it would not have received the contract. A government contract thus tainted from its inception by fraud is void ab initio, like the government contracts held void because similarly tainted by a prohibited conflict of interest in United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S. Ct. 294, 5 L. Ed. 2d 268 (1961), and K & R Eng'g Co. v. United States, 616 F.2d 469, 222 Ct. Cl. 340 (1980).

J.E.T.S., 838 F.2d at 1200. Therefore, to prove that a government contract is "tainted from its inception by fraud" and is thus "void ab initio," the government must prove that the contractor (a) obtained the contract by (b) knowingly (c) making a false statement. We address these elements in reverse order.

1. False statement

In J.E.T.S., we affirmed the Board's decision that the government contractor falsely certified that it was a small business. 838 F.2d at 1201. Similarly, in this case, the government asserts that LISB falsely certified that the "representations and warranties of LISB set forth in § 11(b) [we]re true and substantially correct as of the Purchase Date." Specifically, section 2(c)(7) of the Assistance Agreement conditioned the government's obligations on the receipt of a certificate "signed by the Chairman of the Board of LISB stating" that the "representations and warranties of LISB set forth in § 11(b) are true and substantially correct as of the Purchase Date" and that "[n]o event has occurred and is continuing on the Purchase Date which would constitute, or which with notice or lapse of time or both would constitute, a Breach." It is undisputed that

Conway as Chairman and CEO of LISB[3] had the authority to submit the certification and did so. LISB Summ. J., 54 Fed. Cl. at 615-16. In addition, there is no dispute that Conway's conduct in submitting the certification should be imputed to LISB, and the certification required by section 2(c)(7) constituted a statement to the government.

The falsity of the certification depends on the representation and warranty provisions of the contract. LISB represented and warranted in section 11(b)(5) of the Assistance Agreement that it was "not in violation of any applicable statutes, regulations or orders." The government argued on appeal that the contract thus required LISB to comply with 12 C.F.R. § 563.17(a) (1984), which provided that LISB and Centereach "shall maintain safe and sound management." In addition, the regulations charged FHLBB with "the enforcement of laws, regulations, or conditions against . . . the officers or directors," 12 C.F.R. § 500.3 (1984), and FHLBB required that officers refrain from breaching fiduciary duties involving personal profit, see 12 C.F.R. § 563.39 (1984) ("Termination for cause shall include termination because of . . . breach of fiduciary duty involving personal profit.").

In this case, the Court of Federal Claims found that "Conway and his firm's impropriety under banking laws is evident." LISB Summ. J., 54 Fed. Cl. at 614. Similarly, "based on its findings from the Investigation, the OTS" concluded that Conway "breached his fiduciary duty owed to" LISB. As a result, Conway consented to an order that banned him from the thrift and banking industry and that required him to pay $1.3

---

[3] Neither LISB nor Centereach has raised any issues regarding the Assistance Agreement requiring the certification of the Chairman of LISB but not of Centereach. Indeed, for purposes of the government's counterclaims and affirmative defenses, all of the parties have treated LISB and Centereach as the same in this appeal. Therefore, we do so as well.

million in restitution and reimbursement to LISB. The banks concede that Conway's compensation from the law firm during the time he was Chairman and CEO of LISB and Centereach, between at least 1982 and 1989, "included revenues received by [the law firm] for performing" the "banks' mortgage closing services." Moreover, by pleading guilty to violating 18 U.S.C. § 215, Conway admitted that he committed a crime by corruptly accepting $3,194,103.87 in compensation from the law firm intending to be influenced and rewarded for "the assignment of the LISB residential mortgage closing work to the law firm." Therefore, we agree that Conway breached his fiduciary duties to LISB and Centereach and profited personally from that breach.

Nonetheless, the Court of Federal Claims found that LISB was not operating in an unsafe and unsound manner under 12 C.F.R. § 563.17. The Court of Federal Claims reasoned that "had Conway not accepted compensation related to mortgage closing services of LISB's borrowers, but the relationship between LISB and the firm was otherwise the same, no impropriety would exist." LISB Summ. J., 54 Fed. Cl. at 614. By focusing solely on the relationship between LISB and the law firm, the Court of Federal Claims improperly ignored the relationship between Conway and both LISB and Centereach. Specifically, the Chairman of the Board and CEO of LISB and Centereach breached his fiduciary duties for personal profit. This is not safe and sound management. Even if it were unclear whether Conway's conduct precluded a finding of safe and sound management, LISB represented and warranted in section 11(b)(9) of the Assistance Agreement that it would not "omit to state a material fact necessary to be stated in order to make the statements contained therein not misleading." At a minimum, Conway's conduct was a material fact necessary to make LISB's section

11(b)(5) representation and warranty of compliance with law, including safe and sound management, not misleading.

Therefore, LISB's certification to the government regarding the "true and substantially correct" nature of the representations and warranties made in the Assistance Agreement was false.

2. Knowledge

The Court of Federal Claims found that "[a]lthough LISB knew Conway was being compensated by his firm, this Court cannot conclude that [others at] LISB knew that the arrangement was improper, and, therefore, a misrepresentation." LISB Summ. J., 54 Fed. Cl. at 616-17. We see no error in this factual conclusion. The critical inquiry thus becomes whether Conway had knowledge of the certification's falsity and if so, whether such knowledge may be imputed to LISB.

a. *Knowledge of falsity*

The Court of Federal Claims found that Conway entered into the Assistance Agreement "knowing his conflicting dual relationship with his firm and LISB prohibited him from entering into the Assistance Agreement and from receiving compensation from his firm." LISB Summ. J., 54 Fed. Cl. at 615-16. We agree. First, as discussed, Conway certified under the Assistance Agreement that there were no omissions of material fact regarding LISB's compliance with the law, including the regulation requiring "safe and sound management," that would mislead the government. Second, Conway received two legal opinions before submitting the Assistance Agreement certification stating that he was legally prohibited from receiving compensation from the law firm for legal services relating to any of the banks' loans. Third, the banks concede that

Conway's compensation from the law firms during the time he was Chairman and CEO of LISB and Centereach, between at least 1982 and 1989, "included revenues received by [the law firm] for performing" the "banks' mortgage closing services."

Our conclusion is further supported by the facts surrounding the Assistance Agreement. Neither Conway nor LISB accurately disclosed the compensation from his law firm when prompted by the government in February 1982, February 1983, July 1984, April 1986, or December 1987. In each instance, LISB responded that Conway "retains an interest in a law firm that presently renders service to the Bank and receives remuneration from outside income of said firm." This was false because, as the banks concede, Conway's compensation from the law firm "included revenues received by [the law firm] for performing" the "banks' mortgage closing services." In pleading guilty, Conway also admitted that: "[i]n his capacity as chief executive officer and Chairman of LISB, . . . [Conway] influenced whether LISB continued to use the law firm as its legal counsel for residential mortgage closings"; "[f]rom 1983 through 1989, while holding his executive LISB positions, [Conway] received $3,194,103.87 in compensation from the law firm"; and "[i]n or about and between September 3, 1986, and October 30, 1987, . . . [Conway] knowingly, intentionally and corruptly solicit[ed], demanded, accepted and agreed to accept . . . funds from the law firm paid directly to him, . . . intending to be influenced and rewarded in connection with . . . the assignment of the LISB residential mortgage closing work to the law firm." LISB and Centereach attempt to minimize the significance of Conway's guilty plea, citing to his trial testimony in this case where he explained that he pled to protect his children. However, "a party cannot simply contradict an earlier sworn statement," and there is no credible evidence here

supporting the contradiction. Cf. Gemmy Indus. Corp. v. Chrisha Creations Ltd., 452 F.3d 1353, 1359 (Fed. Cir. 2006) (finding summary judgment grant improper where credible evidence supported contradiction).

In addition, when the banks' outside counsel, ironically hired by Conway himself, discovered Conway's law firm compensation, Conway attempted but failed to enjoin the outside counsel from disclosing the information to the banks and the government regulators. See Doe v. Poe, 595 N.Y.S.2d at 504-05.

Therefore, the record demonstrates that Conway had knowledge of the certification's falsity.

*b. Imputation of knowledge*

While we apply the principles of general contract law to the construction of government contracts, whether federal common law or state law applies to imputation of knowledge is a separate question. In this case, however, we need not decide this choice of law question because we can resolve the issue of knowledge imputation based on legal principles common to both federal and state law.

Under the general common law of agency, "[e]xcept where the agent is acting adversely to the principal . . . , the principal is affected by the knowledge which an agent has a duty to disclose to the principal . . . to the same extent as if the principal had the information." Restatement (Second) of Agency § 275 (1958); cf. Comty. For Creative Non-Violence v. Reid, 490 U.S. 730, 751-52 (1989) (relying on Restatement (Second) of Agency to determine whether hired party is employee under general common law of agency for Copyright Act purposes). Similarly, the Restatement (Second) of Agency § 282 (1958) specifies that a "principal is not affected by the knowledge of an agent in a

transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes" (emphasis added). Regarding the emphasized language, the "mere fact that the agent's primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for the principal's interests." Restatement (Second) of Agency § 282 cmt. c.

The state law of New York has similar standards.

> In general, knowledge acquired by an agent acting within the scope of his or her agency is imputed to the principal and the latter is bound by that knowledge even if the information is never actually communicated. An exception to this rule occurs when the agent has abandoned his or her principal's interests and is acting entirely for his or her own or another's purposes.

Christopher S. v. Douglaston Club, 713 N.Y.S.2d 542, 275 A.D.2d 768 (N.Y. App. Div. 2000) (citing Center v. Hampton Affiliates, Inc., 488 N.E.2d 828, 829-30, 66 N.Y.2d 782 (N.Y. 1985)) (emphasis added). The adverse interest exception "cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal." Center, 448 N.E.2d at 830 (citations omitted).

In this case, under the general rule of imputation, it is undisputed that Conway was an agent of the banks and had knowledge of his illegal compensation scheme. Therefore, the first step indicates that Conway's knowledge should generally be imputed to the banks, and the question becomes whether the adverse interest exception applies.

The Court of Federal Claims found that Conway "ha[d] abandoned his principal's interest and [wa]s acting to defraud his principal, entirely for his own or another's purpose" because "had the knowledge that the Government seeks to impute to LISB actually been disclosed to LISB, the success of Conway's scheme would have been

impaired." LISB Summ. J., 54 Fed. Cl. at 619. We do not agree with this analysis or its conclusion.

It is true that Conway pursued his own interests in his illegal compensation arrangement with his law firm. The mere fact that the agent's primary interests are not coincident with those of the principal, however, is not sufficient to invoke the adverse interest exception. Rather, both federal common law and New York state law require that the agent act "entirely for his own or another's purposes." Here, Conway's arrangement to refer all of LISB's mortgage closings to the law firm served at least two purposes: (1) to funnel to Conway a portion of the fees paid, which would have been paid regardless, by the principal's customers to the law firm; and (2) to obtain the proper legal services required by LISB for its mortgage closings. There was no evidence that the legal services were deficient. There was a clear benefit to LISB through this arrangement because the law firm was the bank's primary outside counsel, performed mortgage closing services for and on behalf of the bank, and represented the bank in foreclosure proceedings. In addition, by signing the false certification under the Assistance Agreement, Conway enabled LISB to acquire Centereach under previously negotiated terms. In hindsight, LISB's interests probably would have been better served had Conway not perpetrated his illegal compensation arrangement, but the record fails to support the assertion that Conway entirely abandoned LISB's interests for his own. Therefore, Long Island cannot invoke the adverse interest exception because the CEO's conduct was not entirely for his own purposes, and the general rule applies imputing the agent's knowledge to the principal. As a matter of law, under both federal

and state legal doctrines governing knowledge imputation, LISB and Centereach knew that the certification to the government was false.

3. Causation

In Godley, we emphasized that for a government contract to be tainted by fraud or wrong doing and thus void ab initio, the record must show some causal link between the fraud and the contract. Godley, 5 F.3d at 1476 (remanding because "this court cannot determine whether [the government agent's] illegal conduct caused any unfavorable contract terms"). In J.E.T.S., the record demonstrated causation because "[h]ad [the government contractor] stated the truth about its size, it would not have received the contract." 838 F.2d at 1200.

Here, the Court of Federal Claims found that the "Government contracted for full disclosure of any conflicts-of-interest in order to assure the safe and sound management of LISB, and it relied on Conway's statements. The Government thus justifiably relied on Conway's misrepresentation." 54 Fed. Cl. at 617. We agree. In its summary judgment briefs to the Court of Federal Claims and on appeal, the government pointed to an affidavit from the government's supervisory agent responsible for recommending whether LISB's acquisition of Centereach should be approved in 1983. The affidavit stated that:

> Had Mr. Conway correctly and accurately revealed the nature and substance of the kickback scheme and/or the fact that Mr. Conway was violating the RESPA anti-kickback provision prior to and during negotiations with the FSLIC and FHLBB for the Suffolk acquisition, I would have recommended that we discontinue discussions and negotiations with [LISB] regarding its acquisition of Suffolk, and I would have recommended that [LISB] be removed as a bidder for Suffolk and or any other supervisory acquisition. I also would not have recommended that [LISB] be permitted to purchase Suffolk.

Vigna Aff. ¶ 14 (emphasis added); see also id. ¶ 15 ("The FSLIC and FHLBB would not provide financial or regulatory assistance to acquirers engaged in the type of serious impropriety at issue in this case."). Moreover, the active breaching of fiduciary duties by the Chairman of the Board and the CEO constitutes material information when the government (a) undertakes a national solicitation for potential acquirers of a declining financial institution; (b) contributes $75 million of cash to the declining institution's net worth within days of the acquisition; (c) conditions performance on a representation and warranty of compliance with the law, including regulations requiring "safe and sound management"; and (d) conditions performance on a representation and warranty that there has been no omission of "a material fact necessary to be stated in order to make the statements contained therein not misleading." Under these circumstances, the only reasonable inference is that had the plaintiffs stated the truth about Conway, they would not have received the contract. The plaintiffs have set forth no affirmative evidence such that a reasonable jury could conclude otherwise. See Anderson, 477 U.S. at 248 (stating that issues of fact are genuine for summary judgment purposes only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). Indeed, the plaintiffs conceded in their complaint that "FSLIC had determined that LISB's bid was the most attractive of all bids, both because it proposed the least amount of financial assistance from FSLIC and because FSLIC was attracted by LISB's proven record of sound financial management." Compl. ¶ 24 (emphasis added).

Accordingly, the government has proven that the plaintiffs obtained the contract by knowingly making a false certification. The Assistance Agreement was thus tainted at its inception by fraud and void ab initio.

**B. Prior Material Breach**

Even if the contract were not void, the doctrine of prior material breach precludes the plaintiffs' breach of contract claim for damages. We have stated:

> Under that doctrine, when a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach. Faced with two parties to a contract, each of whom claims breach by the other, courts will "often . . . impose liability on the party that committed the first material breach."

Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1380 (Fed. Cir. 2004); see also Christopher Village, L.P. v. United States, 360 F.3d 1319, 1334 (Fed. Cir. 2004). In both Barron and Christopher Village, we referenced § 237 cmt. b of the Restatement (Second) of Contracts (1981), which states:

> The rule is based on the principle that where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties of performance with respect to the expected exchange if there has already been an uncured material failure of performance by the other party.

See Barron, 366 F.3d at 1380-81; Christopher Village, 360 F.3d at 1334.

In this case, the government asserts, and we agree, that LISB's false certification constitutes an uncured material failure of performance that precludes the plaintiffs' claim for damages. First, because the Assistance Agreement explicitly conditioned the government's obligations on the receipt of a certificate "signed by the Chairman of the Board of LISB stating" that the "representations and warranties of LISB set forth in § 11(b) are true and substantially correct as of the Purchase Date" and that "[n]o event has occurred and is continuing on the Purchase Date which would constitute, or which with notice or lapse of time or both would constitute, a Breach," the falsity of LISB's

certification as discussed in supra Part III.A.1 represents a failure of performance. Second, based on our discussion of causation in supra Part III.A.3,[4] LISB's failure of performance is material. We have also noted "that our case law holds that any degree of fraud is material as a matter of law." Christopher Village, 360 F.3d at 1335. Third, because LISB's certification was a material condition precedent to the government's obligations, and because the Court of Federal Claims found that the government relied on the certification, LISB's failure of performance in uncured. See Restatement (Second) of Contracts § 242 (1981) (stating circumstances significant in "determining the time after which a party's uncured material failure to render or to offer performance discharges the other party's remaining duties to render performance"). Fourth, it is undisputed that LISB's false certification in 1983 preceded the government's breach with the enactment of FIRREA in 1989.

There is one wrinkle. We have held that "through its continued performance of the contract, the government [may waive] any claim for prior material breach." Barron, 366 F.3d at 1383; see also Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1360 (Fed. Cir. 2005) ("A party to a contract may waive the breach of an agreement by the continued acceptance of performance by the breaching party without reservation of rights."); cf. Old Stone Corp. v. United States, 450 F.3d 1360, 1371 n.6 (Fed. Cir. 2006) (discussing differences between doctrines of waiver and election). We have also stated in this context that "[w]aiver is an affirmative defense, as to which the breaching party

---

[4] We note that the knowledge required for federal common law fraud making a contract void and discussed in supra Part III.A.2 is not required for prior material breach. See Restatement (Second) of Contracts § 235 (1981) cmt. a ("The defect need not be wil[l]ful or even negligent."); id. cmt. b ("When performance is due, however, anything short of full performance is a breach, even if the party who does not fully perform was not at fault.").

bears the burden of proof." Westfed, 407 F.3d at 1360. Here, the banks bear the burden of proving that the government waived its prior material breach defense.

The plaintiffs have not asserted that they received an express statement from the government waiving its prior material breach defense. The question thus becomes whether the government impliedly waived LISB's breach. In Westfed, another Winstar-related case, we stated that "[i]mplied waiver may be inferred by conduct or actions that mislead the breaching party into reasonably believing that the rights to a claim arising from the breach was waived." 407 F.3d at 1361. Because the Assistance Agreement at issue in Westfed included a provision providing a non-waiver clause stating that "[n]o forbearance, failure, or delay by any party in exercising or partially exercising . . . right [given by the Agreement], power, or remedy shall operate as a waiver thereof or preclude its further exercise," we held that "a failure to object does not amount to evidence of waiver." 407 F.3d at 1361 (modifications in original). Similarly, the Assistance Agreement in this case contains a non-waiver provision stating that "[a]ny forbearance or failure or delay by any party in exercising or partially exercising any right, power, or remedy, shall not preclude its further exercise." Assistance Agreement § 15. Therefore, the plaintiffs' fleeting reference of the government's delay, see Appellee Br. 3, does not provide evidence of the government's waiver of its prior material breach defense.[5]

Even without the non-waiver provision, we disagree with the finding of the Court of Federal Claims that "the Government continued to accept LISB's performance under

---

[5] We note as well that the plaintiffs do not appear to dispute the government's summary of this case's procedural history, which shows that the government filed its affirmative defenses and counterclaims before the time negotiated by the parties.

the contract" after discovery of Conway's fraudulent scheme. The Court of Federal Claims did not substantiate its finding, and we can find no evidence of continued government acceptance of LISB's performance in the briefs to the Court of Federal Claims. The record indicates that all of the government's obligations under the Assistance Agreement were completed before the disclosure of the fraud. See U.S. Summ. J. Mot. 19-20, Apr. 17, 2001. The plaintiffs' argument that the government's refusal to take the thrifts back amounts to continued performance, see Pls.' Summ. J. Opp'n 53-54, May 3, 2001, conflates a contractor's claim for recission with a contractor's assertion that the government waived a prior material breach affirmative defense. And the plaintiffs' citations to the record do not support their assertion that the government continued to accept performance under the Assistance Agreement after discovery of the fraud. See Pls.' Summ. J. Supplemental 21 n.12, Jun. 18, 2001 (citing government minutes and a government report from 1990); Appellee Br. 42 (stating that plaintiffs informed the government of Conway's law firm compensation arrangement, at the earliest, in September 1992).

Therefore, the plaintiffs have not shown that the government waived its prior material breach defense, and LISB's false certification constitutes an uncured material failure of performance that provides an independent basis for precluding the plaintiffs' claim for damages.

## IV.

The plaintiffs argue in their combined petition for rehearing and rehearing en banc that holding in favor of the government in this case is "strikingly inequitable." In an analogous case holding a contract unenforceable against the government because the

government contracting agent violated a conflict of interest statute, however, the Supreme Court stated:

> The Court of Claims was of the opinion that it would be overly harsh not to enforce this contract, since the sponsors could not have controlled Wenzell's activities and were guilty of no wrongdoing. However, we think that the court emphasized the wrong considerations. Although nonenforcement frequently has the effect of punishing one who has broken the law, its primary purpose is to guarantee the integrity of the federal contracting process and to protect the public from the corruption which might lie undetectable beneath the surface of a contract conceived in a tainted transaction.

Miss. Valley, 364 U.S. at 564-65; see also J.E.T.S., 5 F.3d at 1475 (citing Miss. Valley in stating that "general rule [of a government contract tainted by fraud or wrong-doing is void ab initio] protects the integrity of the federal contracting process and safeguards the public from undetectable threats to the public fisc"). Moreover, contract law provides for other theories of recovery. See, e.g., Miss. Valley, 364 U.S. at 317 n.22 (discussing quantum valebat recovery). Here, the plaintiffs assert that they seek "only contract damages." Appellee Br. 3. The plaintiffs' argument based on the equities is thus unpersuasive.

## V.

For the reasons discussed above, we reverse the judgment of the Court of Federal Claims. Since we hold that the contract is void ab initio, and that the doctrine of prior material breach provides the government with a legal excuse for its nonperformance, we do not reach the issue of federal common law fraud making the contract voidable or the issues of damages.

REVERSED

Each party shall bear its own costs for this appeal.

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
By: [signature] Date: 1/4/09